[Civ. No. 6349.   Third Appellate District.—December 28, 1940.]

BETTY REIMAN, a Minor, etc., Respondent, v. LUTIE
   HINELINE MOORE et al., Defendants; STOCKTON
   REALTY COMPANY, LTD., Appellant.

James G. Nichols, Gilbert L. Jones, Tom B. Quinn, Jones & Quinn and Levinsky & Jones for Appellant.

Gumpert & Mazzera and C. H. Hogan for Respondent.

PARKER, J., *pro tem.*—The case was before the court at an earlier stage and the opinion of the court on that proceeding is found in 30 Cal. App. (2d) 306 [86 Pac. (2d) 156]. We mention this at the outset, as reference will hereinafter be made thereto with relation to the law of the case as the rule may apply.

The case was tried before a jury and the judgment followed a verdict in favor of the plaintiff.

On this appeal no complaint is made as to any of the rulings in the trial court nor is any fault found in the instructions to the jury. The sole claim is that, accepting the facts as presented by the plaintiff, the appellant was and is entitled to judgment in its favor.

We now refer to the earlier opinion, as cited, for a general statement of the case, supplementing the same in analyzing and discussing the separate points urged upon this appeal.

The appellant Stockton Realty Company is the owner of a certain building in the city of Stockton, being a building three stories in height. The lower or street floor is used for business purposes. The second and third floors constitute an apartment house, having a separate street entrance and individual street number. The upper floors are leased to one Moore, co-defendant, against whom no judgment was rendered and who is not before the court on this appeal. Merely for the sake of accuracy the fact is that Moore is the tenant in possession under an assignment of the original lease. Inasmuch as no point is made on this phase of the case our reference to Moore hereinafter will be as tenant, under the terms of the original lease.

The pertinent portions of the lease may be here noted. The premises leased are designated as "That certain Apartment House Building known as No. 316 N. California St., Stockton, California.", It may be here noted that this description is incorrect, inasmuch as the entire building was not covered by this lease; it being admitted that tenancy of the ground floor was under separate leases to parties other than the lessee of the apartment house. A conceded interpretation of the lease is that the premises demised embraced only that portion of the building used for apartment house purposes. Lessees agree that they are familiar with the condition of the building and accept it in such condition; that they will use the same as and for an apartment house with the usual privilege of renting apartments in said building; that the lessees will and shall keep the demised premises in good repair, at their own cost and expense, and if any repairs are required to be made to either plumbing, electrical installation or *interior* of said building said repairs shall be made at the sole expense of lessees; that the lessees will not and shall not make any alterations, changes or additions in or to the herein demised premises, or any part or portion thereof, without the written consent of the lessor first had and obtained.

On the roof of the building was located a wash room, with an entrance out on the roof, which entrance was a doorway on which was hung a screen door opening out. On the roof immediately in front of the screen door and approximately five feet therefrom was a skylight. This skylight appears to have been the ordinary roof type, three feet wide and four feet long. There was a twelve-inch baseboard and above this were four panes of glass, each seventeen by twenty-eight inches in size, placed on a slope. The area on the roof immediately adjacent to the wash house was used by all occupants of apartments on the floors below as a place for hanging out laundry, and clothes lines were maintained thereon for that purpose.

One of the tenants or occupants of a rented apartment was a Mrs. Green. This lady had become ill and had been confined to a hospital. As she was planning a return to her apartment she had requested certain members of her family to clean up her apartment and have it in readiness for her. Incident to this was the cleaning of the linen and other effects of Mrs. Green. The minor plaintiff herein was a relative of Mrs. Green and she was of the age of fourteen years. Accompanied by her cousin she took part in the preparations attending the homecoming of Mrs. Green. The clothes had been washed and hung out on the line and the plaintiff and her cousin, Leah Wyatt, a girl of sixteen years, went on to the roof to take the wash from the line. The Wyatt girl took the clothes off the line, placing them in plaintiff's arms as they stripped the line. When the clothes were thus gathered the plan was to take them downstairs. Accordingly, Miss Wyatt went ahead to open the doors and the plaintiff followed with the clothes. As the door of the wash room opened out it was necessary for plaintiff to step back to permit the door swing and in so doing her heel struck against some object which tripped her and she fell backward against the skylight. The skylight glass was not strong enough to sustain or break the weight and plaintiff fell through to the floor below, sustaining the injuries complained of.

The first point presented under this statement of facts is whether or not, under the lease, or otherwise, the landlord had control over the premises whereon the accident occurred, and if so, what were his duties to the plaintiff, an invitee.

There can be no question but that the roof of a building is common to the entire building and where that building is leased to various tenants between whom there is no privity

of contract or interest the control of the roof must remain with the landlord.

The primary purpose of the roof of a building is to shelter it and all of its occupants, and consequently, other than for purposes of shelter the tenants are given no easement thereover, as appurtenant to their tenancies, unless their rights be extended by agreement with or license from the owner. (*Smelser* v. *Deutsche Evangelische, etc.*, 88 Cal. App. 469, 474 [263 Pac. 838]. Indeed, appellants do not question this principle of law but contend that under the lease and the conduct of the parties thereunder at least that portion of the roof upon which the apartment house patrons were privileged to hang their laundry was embraced within the demised premises, and as such was under the exclusive control of the lessee.

By the terms of the lease the demised premises were described as "those certain premises commonly known as, and designated as, that certain apartment house building known as No. 316 N. California St., Stockton, California." The entire building was not demised. All parties are in accord to the effect that only part of the building affected was embraced within that portion used as an apartment house.

The lease further restricted the obligation of the lessee as to repairs to the interior of the building and specifically exempted the lessor from liability on account of the condition of stairways or sidewalks. No mention was made of the roof and no rights or privilege, by express agreement or by implication, were granted the lessee in or to any portion of the roof nor was any exemption from liability reserved in the lessor for or on account of roof conditions or repairs.

Throughout the case and on this appeal the right accorded the lessee and her patrons to hang out wash on the roof or use the roof in any way or manner are referred to and described as a privilege and permissive use. Permission implies control existing somewhere and a right existing solely through permission must rest on the consent of the one in control. When the appellants not only admit but apparently urge the point that, aside and separate from the provisions of the lease, the lessor had extended the privilege of the roof for limited purposes to the lessee, it would seem a plain admission of the reserved control in the lessor over all portions of the roof.

Let us assume that at any period of the lease the owner desired to withdraw the privilege or to curtail its enjoyment

through the lease of the roof for display or advertising purposes. Surely no provision in the lease would operate against his right nor could the lessee of the apartment house premises complain. The most that can be said of the arrangement is that the use of the roof by the apartment house patrons was not appurtenant to the use of the apartments but more in the nature of a privilege, beneficial to all parties concerned. It tended to make more salable, as it were, the apartments and thereby more desirable the premises for apartment house purposes. It was equally of benefit to the owner of the building, the operator of the apartment house, and the individual patrons. And, to repeat, it was of vast importance to the tenants of the premises on the ground floor, that a roof be maintained.

We might concede that the lessor, having granted the privilege, might be free from any liability arising from a defect in any of the particular portions devoted exclusively to the user of the tenants; for example, if the clothes line posts were infirm and fell down or if the walk immediately under the clothes line was defective. Any negligence chargeable in such cases might rest upon the apartment house operator, although we concede this merely for purposes of narrowing the discussion. It would seem difficult to picture a situation where an owner leases a portion of a building to one tenant and then says to the tenant, in effect: ''In addition to the premises leased you may have the privilege of using the roof, for purposes incidental to your tenancy, but you must assume the complete responsibility over the roof; if the roof collapses or becomes no longer a shelter, I will repair it for the benefit of the remaining tenants but will permit it to remain in its unusable or unsafe condition, as far as you are concerned.'' A prejudiced or bigoted eye might read into a selected collation of cases something thought to be absurd but we doubt if he would go that far.

As a question of law we hold that the control of the roof remained in the landlord and in support of our conclusion we refer, without quotation, to the following cases: *O. J. Gude Co.* v. *Farley,* 28 Misc. 184 [58 N. Y. Supp. 1036]; *Alfred Peats Co.* v. *Bradley,* 166 App. Div. 267 [151 N. Y. Supp. 602]; *MacNair* v. *Ames,* 29 R. I. 45 [68 Atl. 950, 16 Ann. Cas. 1208]; *Perry* v. *Levy,* 87 N. J. L. 670 [94 Atl. 569]; *Leuch* v. *Dessert,* 137 Wash. 293 [242 Pac. 14]; *Spore* v. *Washington,* 96 Cal. App. 345 [274 Pac. 407].

· ■ With this point determined we pass then to inquire what were the duties of the landlord in the case before us. The answer is found in the law already announced on the prior appeal of the instant case:

"It was the duty of the landlord to keep the particular portion of the premises under his control in a safe condition and not merely in as good condition as the same were at the time of the commencement of the tenancy. . . . 'A landlord letting portions of a building to separate tenants, retaining other portions under his control, is under the responsibility of an owner of real estate who holds out a general invitation to others to enter upon and use his property, and is bound to see that reasonable care is exercised to have the portion thus retained by him reasonably safe and fit for the uses which he has invited others to make of them.' " (*Reiman* v. *Moore*, 30 Cal. App. (2d) 306 [86 Pac. (2d) 156].)

■ The terms "reasonably safe" and "reasonable care" become questions of fact inasmuch as the test of reasonableness is always relative to time, place and circumstance. However, somewhat in amplification, it might be conceded that if there were an open unprotected hole upon the roof in this case, there would be little doubt of negligence, almost as a matter of law. From this state of complete lack of care to a condition of insured security is a wide range of condition. The opening might be covered with cellophane or transparent paper or might be encased in steel, or, as in the instant case, the protective material might have been a thin glass, insufficient to sustain any weight or pressure. Just how far any structure might have been insecure or dangerous was a question for the jury. And the jury could consider the proximity of the opening to any door or entrance generally used by those upon the roof.

There being no complaint as to any instruction given or refused we assume that the jury were fully and fairly instructed on this phase of the case and the implied finding of the jury was that defendant had not fulfilled the duty of care chargeable to it. There was evidence that the defendant owner knew or in the exercise of reasonable prudence should have known the condition of the premises and also evidence supporting the conclusion that the plaintiff was unfamiliar with the premises.

■ There remains then but one phase of the case, namely contributory negligence. Appellants contend that the facts

disclose negligence on the part of plaintiff, as a matter of law, and that such negligence was a contributing factor in the injuries sustained.

The main argument in support of this contention is the claim that the danger was patent and readily observable by whomsoever had occasion to visit the roof. It might be true that the skylight was visible but it does not follow therefrom that the danger was patent. One might lean in confidence against what appeared to be a well-constructed brick wall and the fact that the wall was a cleverly constructed papier-maché affair would not be patent or discernible without the aid of mechanical tests. And so here, one unfamiliar with the premises would not be presumed to see danger lurking in a construction obviously designed for safety under a duty of protection. The act of plaintiff in being on the roof was not negligent; gathering in the wash likewise was in the exercise of common prudence. The act of stepping back to permit entry through the open door was not negligence and surely the accidental fall could not be so classed. In any event, whatever characterization may be given the acts of plaintiff under all of the circumstances was for the jury to determine and we hold that there was sufficient evidence to sustain the finding against the claim of negligence on the part of plaintiff.

There is an important branch of the case that we have reserved and that is the rule of law of the case. Again we refer to the former decision in the instant case reported in 30 Cal. App. (2d) at page 306. It will be seen from a reading of the opinion that at the first hearing in the trial court a verdict was directed in favor of defendants upon the opening statement of plaintiff and it was from that judgment the appeal was taken.

Appellants here contend that the doctrine of law of the case has no application in such a case, arguing the analogy between such a situation and a judgment of nonsuit. To say that the rule has no application is too broad a statement, even in the case of a nonsuit. It is true that there is perhaps a much different application of the rule in such cases but it certainly does apply.

Where, upon appeal, a judgment of nonsuit is reversed, the law is established as applicable to the same facts, if again found. However, when a case wherein a nonsuit had been granted goes to judgment on its merits the same facts may

result in different proof, having in mind the original distinction between evidence and proof. In ruling on a motion for nonsuit the court must disregard all conflicting evidence and accept as true all evidence offered in support of plaintiff's case and give to plaintiff the benefit of any legitimate inference therefrom.

Upon a submission of the same state of facts on the merits the same rule would not apply at the outset; that is, the court, freed from the restrictions outlined, could draw different conclusions, and in that event the law of the case could or could not apply to a different set of facts. But if the trial court after resolving the conflicts and indulging the optional inferences, found the same facts as had been theretofore presented on the nonsuit ruling the law of the case would have been definitely established. And so here. The appellate court practically has told respondent that if she went back to the trial court and established the same facts as set forth in the opening statement and those facts were found in her favor she had then established her cause of action. She did go back and the verdict of the jury, under proper instructions, finds the facts as she has alleged them. Then, upon a second appeal, to state that these facts do not support the verdict would be to practically discard the rule once and for all. This we decline to do.

The judgment is affirmed.

Tuttle, J., and Pullen, P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied on February 24, 1941.