[Civ. No. 12925. Second Dist., Div. Three. July 29, 1942.]

ANNA MATHERNE et al., Appellants, v. LOS FELIZ THE-
ATRE et al., Respondents.

Marcus, Rabwin & Nash, Monroe R. Rubin and A. Feldman for Appellants.

Sidney A. Moss for Respondents.

WOOD (Parker), J.—The verdict of the jury was for plaintiffs, husband and wife, for damages for personal injuries to the wife as a result of slipping and falling, allegedly caused by water on the floor of the entrance to defendants' theater. The trial court granted defendants' motion for judgment notwithstanding the verdict, and judgment was entered for defendants.

Plaintiffs appeal from the judgment and assert that they established a prima facie case of negligence on the part of defendants which was a proximate cause of the injury and that plaintiff was not guilty of contributory negligence as a matter of law.

Plaintiff, Anna Matherne, referred to hereinafter as plaintiff, testified that she was taken to the Los Feliz Theatre by her husband on March 31, 1940, about 6 p. m. and at that time the condition of the weather was "drizzling," the side-

walk was wet; she bought a ticket, entered the theater and stayed about three hours; when she came out she saw it was raining; she looked to see if her husband and the car were there; that she slipped and fell when she had gone out about 8 or 10 steps into the lobby from the theater door, about "by that box office," about one foot in the lobby from the front of the building, and about the center between the box office and the wall; she "picked herself up" and noticed a considerable amount of water on each side of the place where she fell; water was dripping on her, she glanced up and saw it was water dripping from the ceiling of the marquee "as if it were raining," and she noticed the ceiling was wet; the ceiling of the marquee ended about one foot inside the lobby and that was where the water was coming down; the only place where she saw water on the floor was where she fell, it was wet from the wall to the box office and from the edge of the sidewalk into the lobby about one foot, except it was dry where her clothes wiped up the water when she fell; the floor slanted up toward the theater door, the water was seeping toward the sidewalk; from the time she left the door to the time she fell she was looking down where she was walking and out to see if her car was there; before she fell she did not see any water on the floor and did not notice that the floor was slippery; as she went out of the door, before she fell, she saw that the sidewalk was wet; it was raining "very heavy;" when she went into the theater the ticket taker was standing at the door, but she did not remember whether he was there when she came out.

It was stipulated that the lobby floor was of a material known as terrazzo. Three photographs (included in the bill of exceptions) showing the entrance of the theater were offered in evidence by plaintiffs and received.

Defendant Lewis, one of the owners of the theater, testified that the marquee did not extend farther (presumably meaning not farther toward the lobby) than the front of the box office (the photographs show that the front of that office is at the inside line of the sidewalk); he came out through the lobby when he took plaintiff to a doctor and at that time he saw no water dripping from the ceiling; the sidewalk was wet; there might have been a little damp coming in about a foot in from the sidewalk; it was raining pretty hard; plaster on the marquee was very much discolored; he had a bad job on the plaster on the marquee.

Another witness for defendants testified that plaintiff fell on the sidewalk about a foot and a half west of the front of the box office; the front part of the lobby was damp about a foot and a half, caused by people tracking it in; the plaster of the marquee was discolored.

An architect called by defendants testified that the roof of the marquee sloped toward the building into a rain trough; the ceiling of the marquee extended ten inches into the lobby, was cracked in several places and showed discoloration; he did not examine the marquee roof for leaks; the slope of the floor where plaintiff fell was about one-fourth of an inch to the foot and the Building Code allows a slope of one-half inch to the foot.

Another witness for defendants testified that he saw plaintiff come around the corner (referring to a corner outside on the sidewalk), and fall on the sidewalk, get up, and as she started to turn into the ticket office he saw her fall again.

Plaintiff testified she had never seen the last mentioned witness.

■ The rule as to the power of a trial court to enter a judgment contrary to a verdict is stated in *Neel* v. *Mannings, Inc.,* (1942) 19 Cal. (2d) 647, 650 [122 P. (2d) 576], as follows: "... a motion for judgment *non obstante veredicto* may properly be granted 'when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' "

■ Viewing the evidence in the light most favorable to plaintiff, without regard to any asserted contradiction in the proof, as the rule requires the court to do in determining the propriety of a judgment notwithstanding the verdict, it appears there was sufficient basis for concluding: that the water was dripping from the ceiling at a point inside the lobby about one foot from the sidewalk; that plaintiff fell as a result of slipping caused by such dripping of water in the lobby; that she was injured; that defendants "had a bad job on the plaster"; that the plaster on the ceiling of the marquee inside the lobby was cracked in several places and very much discolored; that water was on the floor from the wall to the box office for a distance of approximately one foot in the lobby from the inside line of the sidewalk.

It does not appear, however, in viewing the evidence in such manner, that defendants knew at the time of this incident or prior thereto or at all that water dripped from the ceiling onto the floor inside the lobby, or dripped from the ceiling at all. It further does not appear that water dripped from said ceiling onto the floor of the lobby for such a length of time that defendants or any of them should have known in the exercise of ordinary care of such condition; or, if they were chargeable with such constructive knowledge of such dripping of water, that they had had a reasonable time before plaintiff fell within which to repair such condition or otherwise protect or give adequate warning to persons using the entrance.

As stated by appellants, it was a reasonable inference that the discoloration of the plaster was caused by water. It was not a reasonable inference, however, that because there was discoloration that the water which came in contact with the plaster at that point reached the floor on this or any previous occasion. The condition of the plaster was unimportant except as it may or may not have been an indication that defendants should be charged with constructive notice of a defect in the roof which, in the exercise of ordinary care to protect their patrons, defendants should have repaired.

The record does not show what was meant by the statement defendants ''had a bad job on the plaster,'' or to what extent the plaster was cracked or discolored. The testimony, in such general and comparative language as shown by the record, that defendants ''had a bad job on the plaster,'' and that the plaster was cracked in several places and very much discolored, without further explanation or description, did not justify an inference that defendants should have known that water would leak through it and fall upon the floor.

There are many different conditions which would warrant the classification of plaster construction work as bad, such as wrong proportions of materials, improper mixture, too rough, too thick or thin in application, or unattractive in appearance, which would not be a warning that the roof should be repaired to prevent water from leaking through such plaster and falling upon the floor.

Likewise plaster may be cracked in several places and the condition of the cracks, such as width, length, whether old or new, and number, be such that the cracks would not be notice that the roof should be repaired to prevent water from falling upon the floor.

Discoloration of plaster, even if caused by water, may be of various shades depending upon numerous factors, such as time the discoloration has existed, materials of which the plaster was made, and original color of the plaster, and not be notice of such a defect in the roof that it should be repaired to keep water from the floor.

The fact that plaster on a ceiling was discolored by water leaking through a roof does not signify, because such plaster was not repaired thereafter, that the leak in the roof was not repaired. If there was a leak in the roof it may have been repaired and the plaster not repaired, and the roof may have failed again at or near the old leak. In such an event the discoloration which remained after the prior leak in the roof should not be regarded as a continuing signal of an imperfection in the roof.

The burden was upon plaintiffs to show that defendants had actual or constructive knowledge of a dangerous condition of the premises which proximately caused the accident (Code Civ. Proc., sec. 1981; *Gabriel* v. *Bank of Italy*, (1928) 204 Cal. 244, 246 [267 Pac. 544]), and that such knowledge existed for a sufficient length of time that defendants had a reasonable opportunity to correct the condition or warn its patrons. (*Gold* v. *Arizona Realty etc. Co.*, (1936) 12 Cal. App. (2d) 676 [55 P. (2d) 1254].)

Although plaintiffs tried the case upon the theory, heretofore discussed, that the water on the floor which caused the accident had dripped from the ceiling, another theory, that the water was in fact on the floor whether it dripped from the ceiling or not, should be considered on this appeal inasmuch as the testimony must be viewed in the light most favorable to plaintiffs. The testimony was that water was upon the floor of the lobby from the wall to the box office, about one foot into the lobby from the inside line of the sidewalk. There was no evidence that defendants knew water was there or at all on the floor, except that defendant Lewis said, in referring to a time after the accident when he went through the lobby to take plaintiff to a doctor, "there might have been a little damp coming in about a foot in from the sidewalk. It was raining pretty hard." No showing was made as to the length of time the water was on the floor or any circumstances to indicate that defendants should have known of its presence or that they had a reasonable time in which to remove the water or warn the patrons. It was not shown how long it had

been raining, or raining "very heavy" as plaintiff said, or "pretty hard" as defendant Lewis said. It was established that it was "drizzling" when plaintiff entered the theater about three hours before the accident. There are many different circumstances which might have caused the water to be so recently introduced upon the floor through the lobby entrance that there was not sufficient opportunity to remove or guard against it. It may have been an unprecedented rain, a rain accompanied by unusually strong wind, or several persons entering from the wet sidewalk. The burden was upon plaintiffs to prove that defendants had had a reasonable opportunity to correct the condition or warn the patrons, and plaintiffs failed to meet such burden of proof.

■ In any event the water was inside the lobby to the extent of approximately one foot from the inside line of the sidewalk. Plaintiff said the sidewalk was wet when she went into the theater, that she saw the sidewalk was wet when she came out and it was raining "very heavy." She was required to use ordinary care for her own safety. Plaintiff was required in the exercise of ordinary care, having such knowledge of the heavy rain and wet condition of the sidewalk, in approaching the sidewalk to have in mind the probability that in the ordinary course of events under such weather conditions there might be some water in the immediate proximity of the sidewalk line on the lobby side.

■ If a danger is so apparent that the invitee can reasonably be expected to notice it and protect against it, the condition itself constitutes adequate warning. (*Shanley* v. *American Olive Co.*, (1921) 185 Cal. 552, 555 [197 Pac. 793]; *Dingman* v. *A. F. Mattock*, (1940) 15 Cal. (2d) 622, 624 [104 P. (2d) 26].) It was stated in *Crawford* v. *Pacific States S. & L. Co.*, (1937) 22 Cal. App. (2d) 448 [71 P. (2d) 333], at page 449, in quoting another case, " 'The true ground of liability rests on the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to invitees, over that of the invitee.' "

In the case of *Blodgett* v. *B. H. Dyas Co.*, (1935) 4 Cal. (2d) 511 [50 P. (2d) 801], at page 512 the court said: "The owner of property, in so far as an invitee is concerned, is not an insurer of safety but must use reasonable care to keep his premises in a reasonably safe condition and give warning of latent or concealed perils. He is not liable for injury to an invitee resulting from a danger which was ob-

vious or should have been observed in the exercise of reasonable care."  The duty of the owner of the theater was to use ordinary care to keep the premises in a reasonably safe condition. (*Brown* v. *Holzwasser, Inc.*, (1930) 108 Cal. App. 483 [291 Pac. 661]; *Corbett* v. *Spanos*, (1918) 37 Cal. App. 200 [173 Pac. 769].)

It does not appear that defendants failed in any duty owed to plaintiff.

The judgment is affirmed.

Schauer, P. J., and Shinn, J., concurred.